**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION**

LUKE W. AMOROSO, PhD,

                        Plaintiff,

v.

JANET GOOCH, PhD,

    Serve:  Provost Office
             Truman State University
             McClain Hall 203
             100 East Normal Avenue
             Kirksville, MO.  63501

and

TRUMAN STATE UNIVERSITY

    Serve:  Warren Wells
             General Counsel
             Truman State University
             McClain Hall 201
             100 E. Normal Ave.
             Kirksville, MO 63501

                        Defendants.

Case No.   2:20-cv-55_____

JURY TRIAL DEMANDED

## **COMPLAINT**

      COMES NOW, Plaintiff Luke W. Amoroso, PhD ("Dr. Amoroso"), by and through his

legal counsel., and for his Complaint against Defendants Janet Gooch, PhD ("Dr. Gooch") and

Truman State University ("TSU"), states and alleges as follows:

1

## Type of Case

1.      This is an action for the denial of Dr. Amoroso's due process rights under the Fourteenth Amendment to the United States Constitution, as well as for breach of contract, breach of the implied covenant of good faith and fair dealing, defamation, and 42 U.S.C. § 1983.

## Parties

2.      Dr. Amoroso is an individual who resides in Adair County, Missouri.

3.      Dr. Gooch is an individual who resides in Adair County, Missouri.

4.      TSU is a public institution of higher education located in Adair County, Missouri.

## Jurisdiction and Venue

5.      This Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1331 in that some of the claims arise under the constitution and laws of the United States.

6.      Venue is proper in the United States District Court for the Eastern District of Missouri pursuant to 28 U.S.C. § 1391(b).

## General Allegations

7.      From June 2013 until April 27, 2020, Dr. Amoroso was employed by TSU as an Assistant Professor of Linguistics.

8.      At all times pertinent to this action, Dr. Gooch was employed by TSU as the Provost and Vice-President of Academic Affairs and acting within the course and scope of her employment.

9.      TSU is a public University that receives funds from the federal and state governments.

10.     In a letter (the "Termination Letter") from Dr. Gooch, dated April 27, 2020, Dr. Amoroso was notified that his employment with TSU had been terminated.

11.     Dr. Amoroso was not terminated on the basis of established and published criteria for the evaluation of TSU faculty.

12.     Dr. Amoroso was not terminated on the basis of his teaching ability.

13.     Dr. Amoroso was not terminated on the basis of scholarship.

14.     Dr. Amoroso was not terminated for his service contributions on behalf of TSU.

15.     Dr. Amoroso was terminated so that he would be the scapegoat to shield TSU from potential litigation related to a student intern program in mainland China.

16.     Dr. Amoroso was first appointed to the regular academic staff of TSU in 2015 for a one-year term as an Assistant Professor of Linguistics.

17.     Dr. Amoroso was reappointed as an Assistant Professor of Linguistics by TSU for successive one-year terms in 2016, 2017, 2018, and 2019.

18.     Dr. Amoroso was in his fifth year on the tenure track at TSU when he was terminated by Dr. Gooch.

19.     By Notice of Appointment, dated June 14, 2019, (the "Contract"), Dr. Amoroso was reappointed to the position of Assistant Professor of Linguistics at TSU for the period commencing August 14, 2019, and ending on May 15, 2020.

20.     The Contract contained the following language: "[This Notice of Appointment] is subject to the rules, orders, and regulations of the Board of Governors, including, for academic staff, the Academic Tenure Regulations established by the Board of Governors."

21.     The Contract incorporates into its terms the Code of Policies (the "Policies") adopted by the TSU Board of Governors.

22.     The Policies provide for two types of academic faculty positions at TSU: term appointments for non-tenured faculty and continuous appointments for tenured faculty.

23.     The tenure track at TSU is a seven-year process in which a member of the regular academic staff, such as Dr. Amoroso, is employed pursuant to successive one-year term appointments.

24.     Pursuant to the Policies, the tenure track at TSU annually reviews the performance of faculty, including Dr. Amoroso, on the basis of teaching, scholarly work, and service.

25.     Tenure-track faculty members, such as Dr. Amoroso, invest a great amount of time and talent working toward tenure in reliance upon the promise that TSU will fairly and objectively evaluate their annual performance, free from unfounded criticism or unproven accusation.

26.     In each of his five years at TSU, Dr. Amoroso received outstanding reviews of his performance as a faculty member by his peers, students, and others.

27.     Two years before his termination in April 2020, Dr. Amoroso had successfully completed his midpoint tenure review with Dean James O'Donnell, who observed that "Dr. Amoroso's work in the domains of teaching, scholarly work, and service during these first three years in the Department of English & Linguistics has been outstanding."

28.     The midpoint tenure review is a milestone event in obtaining tenure at TSU.

29.     Upon information and belief, if it has ever occurred, the termination of a tenure-track faculty member in his fifth year at TSU is extremely rare.

30.     Pursuant to the Policies and past practice at TSU, a tenure-track faculty member may be non-renewed on the basis of unsatisfactory performance in teaching and advisement, scholarship, and service.

31.     Although a tenure-track faculty member could also be terminated due to financial exigencies of TSU, Dr. Amoroso was not terminated due to any financial exigencies.

32.    With respect to non-renewal of a tenure-track faculty member on the basis of performance in teaching and advisement, scholarship, and service, the Policies provide a process of awarding tenure at TSU based upon well-documented annual feedback to the tenure-track faculty member as to whether or not he is making satisfactory progress in areas of teaching and advising, scholarship and service.

33.    Dr. Amoroso has always received exemplary annual reviews regarding his performance in the areas of teaching and advising, scholarship, and service.

34.    Prior to the arbitrary decision of Dr. Gooch to terminate his employment, Dr. Amoroso had been assured in each of the four previous years that he was definitely on track to receive tenure, including his comprehensive midpoint tenure review.

35.    The Policies also provide that the tenure-track faculty member works primarily with his Department Chair and Academic Dean to determine appropriate evidence for the demonstration of quality teaching activity that advances student learning, scholarship that encompasses academic and creative contributions to the intellectual life of the university and the profession, and service that offers contributions to the university, the profession, and the enrichment of campus life, as well as discipline-based or university mission-oriented contributions to the community.

36.    The Policies and other procedures promising a merit-based path to obtaining tenure exist to aid in TSU's recruitment and retention of faculty.

37.    Upon information and belief, TSU awards tenure at a higher rate than other post-secondary educational institutions as a way to compete with other institutions that have more resources available to them than TSU.

38.     Dr. Amoroso was recruited to TSU and induced to remain employed there in reliance upon the promise of TSU to abide by the Policies in evaluating his performance as he worked toward tenure as a faculty member.

39.     Pursuant to the Policies, a tenure-track faculty member may be terminated due to misconduct justifying termination for cause.

40.     With respect to termination for cause, the Policies provide that a member of the regular academic staff under a term appointment, such as Dr. Amoroso, may only be terminated for cause prior to expiration of the term appointment.

41.     The Policies provide "the dismissal for cause of a teacher previous to the expiration of a term appointment, should, if possible, be considered by both a faculty committee and the governing board of the institution"

42.     The Policies contain a detailed procedure to guarantee due process to a terminated faculty member prior to the expiration of a term appointment, including, but not limited to, the following:

   a.   Removal for cause must be recommended by the Dean or other appropriate administrative officer designated by the Board of Governors.

   b.   The faculty member must be informed in writing of the charges against him.

   c.   Suspension of the faculty member, if the charges would interfere with the faculty member's duties and/or effectiveness as a teacher.

   d.   Review before the Committee on Tenure, if requested by the faculty member.

   e.   Review of the Committee on Tenure's decision before the Board of Governors of TSU.

43.     These procedural safeguards were not followed by Dr. Gooch and TSU when Dr. Amoroso was terminated for cause.

44.     Dr. Amoroso's termination was not recommended by the Dean.

45.     Dr. Amoroso was not informed in writing of the false charges purportedly warranting his termination.

46.     Dr. Amoroso was suspended even though the false charges made against him by Dr. Gooch would not interfere with his duties or effectiveness as a teacher.

47.     Dr. Amoroso requested, and was denied, review of his termination by the Committee on Tenure.

48.     Dr. Amoroso was denied review of his termination by the Board of Governors.

49.     Pursuant to the Policies, Dr. Amoroso could not be terminated prior to the expiration of his term appointment without a hearing before the Committee on Tenure and an opportunity to appeal that decision to the Board of Governors.

50.     The termination letter from Dr. Gooch, dated April 27, 2020, stated the false allegation that Dr. Amoroso was terminated for "dishonesty", which the Policies define as a termination for cause.

51.     The letter from Dr. Gooch, dated April 27, 2020, also vaguely and falsely accused Dr. Amoroso of a "lack of character" without any relevant factual allegation of misconduct that would justify her opinion or warrant his termination.

52.      Upon information and belief, this alleged lack of character concerns a patently false and highly defamatory accusation communicated by Dr. Gooch to TSU General Counsel and repeated by him in a letter, dated April 2, 2020.

53.     A few weeks prior to the letter from TSU's General Counsel, Dr. Gooch had stated to Dr. Amoroso's colleagues that he had been suspended for serious allegations of misconduct unrelated to his travel to mainland China with three student interns (the "China trip").

54.     The letter from Dr. Gooch, dated April 27, 2020, also alleges "poor judgement" [sic] in the performance of his faculty responsibilities in connection with the "China trip".

55.     The false accusations of dishonesty and other misconduct in the referenced letters of April 2 and April 27 establish that Dr. Amoroso was terminated for cause for which the Policies afford him the right to a hearing and other due process.

56.     By the fall term of 2019, Dr. Amoroso had entered his fifth year on the tenure-track and could reasonably expect to be awarded tenure if his performance in teaching, scholarship, and service continued to meet TSU's academic standards.

57.     When Dr. Amoroso made the career decision to join the faculty of TSU in 2015, he did so in reliance upon TSU's fair, objective, and good faith execution of the Policies that govern the attainment of tenure.

58.     By the fall term of 2019, Dr. Amoroso had earned consistently high praise from the TSU administration, faculty, and students for his teaching and advising, scholarship and service in his annual performance reviews.

59.     At the conclusion of his first year as a faculty member at TSU, Dr. Amoroso's tenure-track review was conducted by TSU Dean James O'Donnell, who commended Dr. Amoroso for his many contributions to the University and commented: "In sum, we're fortunate to have him on our faculty."

60.     Dr. Amoroso's second-year tenure-track review in 2017, also authored by Dean O'Donnell, described him as "dynamic, innovative, and engaging", with positive student

comments that are "bountiful", and concluding: "It is clear that Luke continues to display accomplishment, vision, high expectations, enthusiasm, effectiveness, and collegiality.   I unconditionally recommend reappointment."

61.     The third-year tenure-track review of Dr. Amoroso in 2018 stated the summary observation that "it seems clear that Dr. Amoroso's work in the domains of teaching, scholarly work and service during these first three years in the Department of English and Linguistics has been outstanding".

62.     Dr. Amoroso's fourth-year tenure-track review in 2019 was performed by Dr. Mary Shapiro, Chair of the Department of English and Linguistics, who was similarly effusive in her praise, noting Dr. Amoroso's "excellent" teaching evaluations; his significant contributions to the department, the University, and his profession; that he is "greatly beloved" by his students; and that he was a finalist for TSU Educator of the Year in 2018.

63.     Dr. Amoroso's fifth-year review, dated March 9, 2020, authored by Dr. Shapiro at the very time that he was suspended and in the process of being terminated by Dr. Gooch, reflects the level of performance that he had rendered to TSU:

> "I found him to be a thoughtful, reflective practitioner, with sincere concern for the progress of his students and advisees, and evident love of and pride in teaching. His scholarship is current and first-rate, and relates directly to his teaching. I continue to agree with the evaluation given by his midpoint-to-tenure committee, which identified him as being "on a clear path to promotion and tenure," and with the evaluation given by the Provost at the end of last year's review cycle: that Dr. Amoroso was "performing well in all areas: teaching, scholarship and service."

> "I discussed with Dr. Amoroso the fact that his consulting work with the Federal Bureau of Investigation is, in fact, an important part of his scholarly agenda. His election by his peers to a second term as "master tester" shows the esteem in which they hold his work. This also constitutes another *category* of service for which Dr. Amoroso does not take enough credit – he contributes to the department, the larger campus community, the larger Kirksville community, but also to the discipline and profession."

"We are fortunate to have a linguist with this particular combination of skill sets".

"I have been barraged all semester with student testimonials for him."

"Dr. Amoroso is a pleasure to work with; **he is very much the glue that keeps the linguistics program(s) together**." (*emphasis added*).

64.      In the five years Dr. Amoroso taught at TSU, he was one of a very few faculty members nominated three different years for the high honor of "Educator of the Year", including one year in which he was a finalist.

65.      In spite of this record of outstanding performance and the complete absence of any negative feedback in his annual tenure-track evaluations, Dr. Amoroso was terminated by Dr. Gooch.

66.      Every Spring and Fall semester since the Fall 2013 semester, TSU students have been offered a study abroad program, commonly known as "CHN 550: EFL [English as a Foreign Language] Internship in China", in which TSU students are afforded the opportunity to teach English to students at a middle school and elementary school in mainland China.

67.      Each semester, the Chinese host schools arranged for the necessary permission and documentation from the Chinese consulate to allow the TSU student interns to participate in this student intern program.

68.      With the proper visas and documentation in hand by the start of each semester, the TSU student interns were escorted to their destination in China by a member of the TSU faculty.

69.      The TSU faculty escort would remain with the student interns for a few days to acclimate them to the community, to their Chinese hosts, and to essential food, transportation, and public safety services for their semester stay in mainland China.

70.     Having lived and traveled extensively in both China and Hong Kong, and being fluent in Mandarin Chinese, in 2017 Dr. Amoroso volunteered to fill the void of a departing professor by serving as the faculty escort for the TSU student interns in the CHN 550 program.

71.     For four consecutive semesters, Dr. Amoroso assisted the TSU student interns without complication in preparing for and traveling to their Chinese destination.

72.     From the inception of this China student intern program until the Fall semester of 2019, the TSU student interns had always been allowed to remain in China for the semester and teach in the host schools.

73.     For the Fall 2019 Semester, three TSU students (the "Student Interns") applied for the CHN 550 program.

74.     In early 2019, following the same procedure as on previous occasions, the Principal of the school hosting the Student Interns contacted the Chinese consulate and obtained approval for them to perform unpaid student teaching during the Fall semester.

75.     Following this approval, the Chinese consulate provided the Student Interns with visa applications that were timely submitted as in each previous semester and issued without any complication.

76.     On August 31, 2019, Dr. Amoroso escorted the Student Interns to the city in mainland China where they would be hosted by members of the faculty and administration at the host schools.

77.     Consistent with the travel itinerary published by Dr. Amoroso, and in keeping with the procedure followed by him and the previous program coordinators for CHN 550 in years past, Dr. Amoroso remained with the Student Interns in China for four days after their arrival to get

them acquainted with their hosts and familiarized with the places where they could obtain items they might need during their four-month stay.

78.     On Thursday, September 5, 2019, Dr. Amoroso departed mainland China, returning through Hong Kong, where he stayed for the weekend.

79.     On Monday, September 9, 2019, as he stood in line at the Hong Kong airport waiting to board his return flight to the United States, Dr. Amoroso received a phone call from one of the Student Interns.

80.     This Student Intern told Dr. Amoroso that the local police had come to their apartment and asked to examine the Student Interns' passports and other credentials.

81.     It is not unusual in China for the local police to monitor the presence of foreigners within its jurisdiction, and a similar examination of student intern credentials by police had occurred in the Fall 2018 Semester.

82.     This Student Intern told Dr. Amoroso that they might not be allowed to teach.

83.     In response to this information, Dr. Amoroso first confirmed that the Student Interns were safe in their apartment, unafraid, and in possession of their passports.

84.     Dr. Amoroso immediately contacted the Chinese host concerning the matter and was assured that it was a minor bureaucratic issue and that the Student Interns would be allowed to teach.

85.     Dr. Amoroso then informed Tim Urbonya, TSU Executive Director of International Education, of the situation.

86.     No one at TSU instructed Dr. Amoroso to remain in Hong Kong or to make the long journey back to the mainland where the Student Interns were staying.

87.     Confident that the Student Interns were safe, and assured that the matter would be easily resolved by their Chinese hosts, Dr. Amoroso boarded his flight and returned to the United States.

88.     Following his arrival in the United States on the evening of September 9, Dr. Amoroso's intuition was confirmed when he and Mr. Urbonya received an email indicating that there was "Nothing to worry about"; a "new policy" of the Chinese authorities required the host school "to submit certain information to the security office".

89.     The next morning Mr. Urbonya reported to Dr. Gooch that the matter was bureaucratic in nature, would soon be cleared up, and, most importantly, that the Student Interns were safe.

> "… the school in China will be able to provide the documentation the public security bureau needs in order to allow the students to teach – but it may take a few days. I'm communicating with the students … .  Again, **they are not in any danger**." (*emphasis added*).

90.     In spite of the best efforts of the Chinese hosts, the TSU study abroad staff, and Dr. Amoroso, the Student Interns were not permitted by the Chinese authorities to teach in China that semester and had to return home.

91.     Upon information and belief, the local Chinese authorities refused to allow the Student Interns to teach because they did not have a Foreign Worker's Permit, even though the Student Interns were not to be paid and previous student interns had not been required to have such a permit.

92.     In effect, the local Chinese authorities interpreted Chinese visa laws differently than the Chinese consulate which issued the student visas, and, in effect, the local Chinese authorities prohibited the Student Interns from providing the teaching services that the Chinese consulate had authorized.

93.     Despite not being able to participate in CHN 550, the course schedules of the Student Interns were quickly rearranged so they would not suffer any academic harm or loss of credit hours toward graduation as a result of the cancelled internship.

94.     Upon information and belief, the Chinese laws and regulations pertaining to visas and work permits are numerous, complicated, and not uniformly enforced.

95.     Dr. Amoroso is neither an attorney nor an expert on Chinese visa laws.

96.     It was not the responsibility of Dr. Amoroso to provide legal advice concerning the necessary documentation to allow the Student Interns to teach in China.

97.     Once the Student Interns credentials had been questioned by the local Chinese authorities, it was not within the expertise or the responsibility of Dr. Amoroso to fix that documentation.

98.     Dr. Amoroso has never once been provided with guidance, polices, procedures, or directives concerning the steps he should take if student visas are deemed improper by the hosting country.

99.     At no point from September 9, 2019, the time Dr. Amoroso and TSU first learned of the visa issue, through October 2019, did Dr. Gooch or any TSU administrative officials question Dr. Amoroso about the China trip.

100.    Upon returning to the United States, one of the Student Interns withdrew from TSU.

101.    Thereafter, that Student Intern's father expressed concern over the impact the student's withdrawal would have on the student's academic record.

102.    The Student Intern's father submitted multiple Sunshine Law requests to TSU for documents, emails, text messages, etc. from TSU faculty and administrators concerning the China trip.

103.    In November 2019, Dr. Gooch approached Dr. Amoroso for the first time and requested his explanation of the visa issue that doomed CHN 550 during the Fall 2019 Semester.

104.    On December 12, 2019, Dr. Gooch told Dr. Amoroso for the first time he would receive a letter of reprimand in his personnel file and that he would not be allowed to lead CHN 550 anymore.

105.    Dr. Gooch also stated to Dr. Amoroso that the purpose of the letter of reprimand was to placate the Student Intern's father and that TSU feared a lawsuit from him due to the withdrawal of the Student Intern from TSU.

106.    During that same meeting on December 12, Dr. Gooch made it abundantly clear to Dr. Amoroso that he would not be fired, that a letter of reprimand was "no big deal", and that the letter served the purpose of showing the student's father that TSU took the matter seriously.

107.    Later that same day, Dr. Amoroso met with his Department Chair, Dr. Shapiro, to inform her of his conversation with Dr. Gooch. The department chair spoke with Dr. Gooch, who reassured Dr. Shapiro that, at worst, Dr. Amoroso had displayed an error in judgment, that he would not be fired, and that he should not "freak out."

108.    On December 20, 2019, Dr. Gooch called Dr. Amoroso to her office and presented him with a letter describing a "Temporary Interim Suspension with Pay until [TSU] is able to investigate the facts and **determine if termination of employment is warranted**." (*emphasis added*.)

109.    The letter stated that Dr. Amoroso was being suspended for the following reasons:

- "On September 5, 2019 during your return to the United States you traveled from Shuizhai to Hong Kong after being told by Tim Urbonya, Executive Director of International Education, to redirect travel to avoid Hong Kong."

- "You subsequently remained in Hong Kong until September 9, 2019 when you had no [TSU] business/purpose for being there."

- "While in line to board your flight home to Chicago, you were contacted by [a Student Intern] saying that the students would not be able to teach in Shuizhai and in spite of this information, you boarded the plane and returned to the U.S."

- "You made no attempt to contact Tim Urbonya, or anyone else to report the problem and by the time you returned to Kirksville, Tim had already been informed of the problem via Truman State Department of Public Safety."

110.    Dr. Gooch's letter "called into question" Dr. Amoroso's alleged failure to obtain the proper visas for the students, his weekend in Hong Kong, and his "failure to exercise due care" in returning to the U.S. after being contacted by the Student Intern.

111.    Dr. Gooch's letter stated that Dr. Amoroso's suspension was effective immediately, was indefinite, and would last until TSU could "determine if termination of employment is warranted."

112.    On the very same day that he was suspended by Dr. Gooch, Dr. Amoroso presented her with a written response to the suspension that refuted each of her accusations with supporting documents and explained why the suspension was unwarranted, *e.g.*:

- <u>On his return through Hong Kong</u>. "Tim Urbonya, Will Storm, and I agreed that Hong Kong should be avoided for travel with the students. I re-routed travel to avoid Hong Kong on the trip to China and the students and I flew through Beijing instead. At this point, all of us (students and I) still had return tickets through Hong Kong. … Tim did not direct me to avoid Hong Kong on my return trip to the U.S. from China."

    "I took 3 personal days over a weekend in Hong Kong after getting the interns set-up in Shuizhai. I paid for this myself and did not charge [TSU] funds for my hotel, travel, or food on those days."

- <u>On his decision to return to the U.S.</u> "While boarding my flight to return to the U.S., [a Student Intern] contacted me and said that the interns had been interviewed by the police and that their passports had been taken for inspection by the local authorities. [The Student Intern] said that they thought the interns might not be able to teach, but that they were unsure. I asked [the Student Intern] if the interns were safe. [The Student Intern] said 'yes'. I asked if they were in their apartments and if they could move about

the town freely. [The Student Intern] said 'yes'. I asked if they had their passports. [The Student Intern] said 'yes'. I immediately tried to make contact with Kevin (my primary contact at Shuizhai Middle School) as I assumed this was a paperwork matter that the school could handle."

"At this point, I needed to decide whether to [return] to the U.S. or return to Shuizhai. I was not worried about the interns' safety in any way. Our interns the previous semester had their passports inspected by the local authorities as well, and with no ill effect. Having your credentials inspected in China is not at all unusual (you give all of your fingerprints, your passport for inspection, and your face to be scanned at every entry and exit from the country) and so I was not concerned with a visit from the authorities to look at passports and visas. Passport inspection is a normal part of life for foreigners in China, and visits from the authorities are not at all unusual."

"To be clear, [the Student Intern] did not tell me that the interns would not be allowed to teach, but rather that they thought that was a possibility. My assumption was that there was some kind of miscommunication and that I would get it cleared up upon my return to the U.S. In the 10+ years of the program, the interns were never told that they could not teach, so I assumed the issue would be straightened out relatively quickly by Kevin."

"As it would have taken me at least 15-20 hours to return from Shuizhai from Hong Kong, there was nothing I could do immediately in either case, so I decided to return to the U.S."

- On his alleged failure to contact anyone to report the problem:  "[After speaking with the Student Intern while waiting to board my return flight to the United States] I immediately tried to make contact with Kevin (my primary contact at Shuizhai Middle School) as I assumed this was a paperwork matter that the school could handle."

- On his alleged failure to obtain the appropriate visas. "As in years past, a letter of invitation was issued by Shuizhai Middle School describing what the interns and I would do in China and why we were invited. I submitted this letter of invitation to the Chinese Consulate in Chicago (via a visa-processing agency), along with visa applications, and, as in years past, the Consulate provided the appropriate visa based on the invitation letter."

"I applied for a visa to allow the students to teach in China. The visa was granted. If the Chinese Consulate provides a visa to allow the interns to teach in China, then it is, by definition, the appropriate visa. If the visas obtained were not appropriate, then the Chinese Consulate is at fault, not me."

<u>On his alleged "failure to exercise due care"</u>.  "In terms of "due care" for the interns, this is not a typical faculty-led program. It does not involve, and never has involved, me or the previous internship coordinator staying with the interns in Shuizhai for an extended period of time. I bring them to Shuizhai, help them shop for necessities, walk around town with them and get them oriented to the layout of the city, introduce them to teachers and administrators in Shuizhai and Datian, and then I supervise their coursework remotely as they live independently in China. This is what the students signed up for when they agreed to participate in this internship. This internship requires a great deal of independence. This is how the internship was run by the previous internship coordinator for many years and this is thus how I continued to run it for the 3 years I've been involved. I absolutely provided due care to the interns, as did their hosts in China, who treated them very well. To say that I did not provide due care for the interns is simply not true. I, in concert with our Chinese partners, took excellent care of them."

113.    Upon his arrival in the United States, Dr. Amoroso was immediately in contact with Tim Urbonya and others, who had independently confirmed and communicated to Dr. Gooch that the Student Interns were in no danger and that the matter should be cleared up in a few days.

114.    Despite offering to meet with Dr. Amoroso in her original December 20, 2019, suspension letter, Dr. Gooch instead called Dr. Amoroso to tell him his suspension would stand.

115.    Having shown her allegations to be false, Dr. Amoroso asked Dr. Gooch for an additional explanation for his suspension, to which she replied that she would issue a new suspension letter.

116.    During this telephone conversation, Dr. Gooch stated it "was looking likely" that Dr. Amoroso would be terminated because Dr. Amoroso left the Student Interns in China instead of going back to "be with them."

117.    On January 6, 2020, Dr. Gooch provided her revised suspension letter, which recommended Dr. Amoroso "be placed on Temporary Interim Suspension with Pay until [TSU] is able to investigate the facts and determine if termination of employment is warranted." And

18

narrowed the focus of Dr. Amoroso's suspension to the following: (a) Dr. Amoroso traveling to the United States through Hong Kong; (b) Dr. Amoroso taking personal days to spend in Hong Kong; and (c) Dr. Amoroso's decision to travel to the United States rather than returning to Shuizhai.

118.    As the Spring 2020 Semester started, Dr. Gooch informed TSU faculty of Dr. Amoroso's suspension.

119.    On their own initiative, and without the direction, assistance, or involvement of Dr. Amoroso whatsoever, TSU faculty and students began a letter writing campaign to TSU administration (including but not limited to the Board of Governors and Dr. Gooch) asking for Dr. Amoroso to be reinstated.

120.    Perhaps sensing her mistake in having suspended one of the most popular members of the TSU faculty, Dr. Gooch defended her actions by telling the faculty Dr. Amoroso was being investigated for "serious allegations" unrelated to the China trip.

121.    Dr. Gooch reiterated the accusation to Dr. Amoroso's department chair that he was being investigated for "serious allegations."

122.    To date, Dr. Gooch has never told Dr. Amoroso what "serious allegations" have been made against him.

123.    When pressed by members of the faculty and Dr. Amoroso's department chair, Dr. Gooch implied that he was being investigated for misconduct that would justify his termination.

124.    The actions of Dr. Gooch have led to rampant, salacious, and potentially career-ending rumors and speculation about Dr. Amoroso.

125.    Upon information and belief, Dr. Gooch has, at worst, intentionally and deliberately defamed Dr. Amoroso in order to excuse her decision to suspend Dr. Amoroso in the first place,

or, at best, has done so recklessly, indifferently, and in conscious disregard for the rights of Dr. Amoroso.

126.    Despite multiple requests and pleas from Dr. Amoroso and others for the specific nature of the so-called "serious allegations" against him, Dr. Gooch has failed to elaborate on her public comments to TSU faculty and students.

127.    Dr. Gooch held a meeting with the Classical Modern Languages Department and the Department of English and Linguistics on February 4 to discuss Dr. Amoroso's absence from teaching.  When asked at that meeting by TSU faculty members, "So are you telling us that there's something else that had happened that you can't talk about that is not his decision making with regards to the visa and that's the thing that's being investigated?", Dr. Gooch replied, "**I'm just saying there is more than what seems to be at the surface."**

128.    Near the end of this meeting, Dr. Gooch commented:

"I'm not just [suspending Dr. Amoroso] because I can. Okay. I understand the ramifications. I've had multiple conversations with [Dr. Amoroso's department chair], multiple conversations with [the TSU President and General Counsel]. This is not something I just flipped a coin, heads he's gone… All I can tell you is that this is not an easy decision for the administration, **and there's more to it, okay**."

129.    By her comments, Dr. Gooch clearly insinuated that Dr. Amoroso was not suspended because of his alleged failure to obtain proper visas.

130.    Upon information and belief, Dr. Gooch told TSU faculty and administrators on other occasions that Dr. Amoroso's suspension did not relate to anything that happened to the interns in China.

131.    In spite of Dr. Gooch's statements to faculty and administrators that "there's more to it", the suspension letters from Dr. Gooch to Dr. Amoroso centered around CHN 550.

132.    Contrary to the suspension letters and consistent with the public and private comments of Dr. Gooch, the letter from TSU General Counsel, dated April 2, 2020, falsely accused Dr. Amoroso of misconduct unrelated to CHN 550.

133.    The Termination Letter made false accusations of unspecified misconduct.

134.    Although Dr. Gooch has attempted to disguise her action as a non-renewal of Dr. Amoroso's sixth-year contract in an attempt to avoid a hearing before the Committee on Tenure and review by the Board of Governors, the action was a "de facto" termination for cause prior to the expiration of a term appointment.

135.    Dr. Gooch and TSU had no performance-based information to justify a non-renewal of Dr. Amoroso's sixth-year contract.

136.    Upon information and belief, Dr. Gooch has never refused to renew a contract for a sixth-year tenure-track faculty member.

137.    Upon information and belief, Dr. Gooch and TSU attempted a non-renewal of Dr. Amoroso's sixth-year contract, because they had a reasonable degree of confidence that Dr. Amoroso would be absolved of any wrongdoing by the Committee on Tenure and the Board of Governors.

138.    As a direct result of Defendants' acts, Dr. Amoroso has sustained damages, including but not limited to: a) denial of his rights guaranteed him by the Constitution and laws of the United States; b) denial of rights guaranteed him by the Contract and Policies; c) loss of his employment; d) loss of his investment of time and resources in tenure-track progress; e) loss of reputation; f) damage to his teaching career; g) humiliation and mental anguish; and h) attorneys' fees and expenses.

139.     Paragraphs 1 through 138 above are incorporated by reference into each Count of this Complaint as if fully set forth therein.

**COUNT I – DENIAL OF PROCEDURAL DUE PROCESS**

For Count I of his Complaint, Dr. Amoroso states and alleges as follows:

140.     The Fourteenth Amendment to the United States Constitution guarantees procedural due process before the State may deprive any person "of life, liberty, or property".

141.     Based upon the language of the Contract and the Policies incorporated into the Contract, Dr. Amoroso had a property interest in the retention of his employment as a faculty member at TSU.

142.     This property interest arises from the language of the Contract and the Policies which dictate the grounds upon which he could be terminated for cause or not reappointed.

143.     The Policies provide that: a) if he is terminated for cause, he must be provided notice of the reasons for his termination and a hearing to determine the validity of those reasons; and b) if he is not reappointed for a sixth year, the decision must be based upon substandard performance in the areas of teaching and advisement, scholarship, or service.

144.     The Policies provide that, absent misconduct warranting termination for cause, a tenure-track member of the regular academic staff will be judged on his or her performance with respect to teaching and advisement, scholarship, and service.

145.     Dr. Amoroso did not engage in any conduct that would warrant termination for cause.

146.     Dr. Amoroso's performance in the areas of teaching and advisement, scholarship, and service warranted his reappointment.

147.    Because Dr. Amoroso was terminated for cause (alleged "dishonesty", etc.)  during the period of his term appointment, he was entitled to due process, including notice and a hearing on the propriety of his termination.

148.    Because Dr. Amoroso had far exceeded the performance criteria for reappointment, he is entitled to a hearing on the propriety of the non-renewal of the Contract.

149.    The Policies do not authorize the Provost to make arbitrary and unfounded decisions to non-renew a tenure-track faculty member based upon factors that do not fall into the categories of performance or misconduct.

150.    Dr. Amoroso has been denied due process in the decision by Dr. Gooch and TSU not to reappoint him for a sixth year.

WHEREFORE, Plaintiff Luke Amoroso prays for judgment against TSU allowing him a hearing on his termination or non-renewal, reappointing him to the sixth-year of his tenure-track faculty position, for his costs incurred herein, and for such other and further relief as the Court deems just and proper.

## COUNT II – BREACH OF CONTRACT

For Count II of his Complaint, Dr. Amoroso states and alleges as follows:

151.    On June 14, 2019, TSU approved the Contract reappointing Dr. Amoroso to the fifth year of his tenure-track faculty position.

152.    The Contract commenced on August 14, 2019, and would terminate on May 15, 2020.

153.    The Contract incorporated by reference the Policies and the rules, orders, and regulations of the Board of Governors, including for academic staff, the Academic Tenure Regulations established by the Board of Governors.

154.    The Contract was breached by TSU in the following respects:

a)      Dr. Amoroso was terminated for alleged cause without being afforded a hearing; and/or

b)      Dr. Amoroso was not reappointed on the basis of false accusations related to the China 550 program; and/or

c)      Dr. Amoroso was not reappointed due to arbitrary criteria unrelated to his performance in the areas of teaching and advisement, scholarship, and service; and/or

d)      Dr. Amoroso was denied a hearing related to his termination and/or non-renewal.

155.    As a direct result of TSU's breach of contract, Dr. Amoroso has sustained damages due to his termination and/or non-renewal.

WHEREFORE, Plaintiff Luke Amoroso prays for judgment against Defendant TSU allowing him a hearing on his termination or non-renewal, reappointing him to the sixth-year of his tenure-track faculty position, for damages resulting from the loss of his employment, for his costs incurred herein, and for such other and further relief as the Court deems just and proper.

### COUNT III – BREACH OF GOOD FAITH AND FAIR DEALING

For Count III of his Complaint, Dr. Amoroso states and alleges as follows:

156.    The Contract contained an implied covenant of good faith and fair dealing.

157.    This implied covenant required Defendants to act in good faith and abide by the Policies in imposing a termination for alleged cause or in deciding not to renew the Contract.

158.    Defendants breached this covenant: a) by failing to provide Dr. Amoroso notice of the reasons for his termination and a hearing; and b) by arbitrarily deciding not to renew the Contract based upon false information and criteria not contained in the Policies.

WHEREFORE, Plaintiff Luke Amoroso prays for judgment against Defendants allowing him a hearing on his termination or non-renewal, reappointing him to the sixth-year of his tenure-track faculty position, for damages resulting from the loss of his employment, for his costs incurred herein, and for such other and further relief as the Court deems just and proper., for his costs incurred herein, and for such other and further relief as the Court deems just and proper.

## COUNT IV – DENIAL OF SUBSTANTIVE DUE PROCESS

For Count IV of his Complaint, Dr. Amoroso states and alleges as follows.

159.    The Fourteenth Amendment to the United States Constitution guarantees substantive due process before the State may deprive any person "of life, liberty, or property".

160.    Dr. Amoroso had a "liberty" interest in the renewal of his contract as a faculty member at TSU.

161.    By 2020, Dr. Amoroso had invested five years of his career working toward tenure at TSU.

162.    Tenure at TSU is to be awarded to a tenure-track faculty member on the basis of performance in the areas of teaching and advisement, scholarship, and service.

163.    The arbitrary personal feelings of the Provost, unrelated to performance, are not part of the criteria for the renewal of a contract of tenure-track faculty at TSU.

164.    At no time in his career at TSU, including during his period of suspension in 2020, has Dr. Amoroso received anything other than high praise for his performance in the areas of teaching and advisement, scholarship, and service.

165.    Dr. Amoroso also had a "liberty" interest in the preservation of his individual privacy.

166.    In the Termination Letter, Dr. Gooch specifically harmed the reputation of Dr. Amoroso by accusing him of "dishonesty", "poor judgement" [sic], "deplorable" conduct, and "lack of character".

167.    These false and malicious attacks upon Dr. Amoroso's good name and reputation entitle him to the due process guarantees of the Fourteenth Amendment, including the right to know the specific allegations and a right to a hearing to reveal the truth.

168.    TSU's purported investigation into Dr. Amoroso's weekend in Hong Kong was, in truth, nothing more than an attempt to infringe upon his constitutionally-protected right of privacy by investigating his private life.

169.    The correspondence of TSU's General Counsel, dated April 2, 2020, clearly demonstrates that, under the guise of investigating the China trip, TSU was really investigating malicious and false speculation about his personal life.

170.    With absolutely no evidence to support such wild speculation, and in the face of Dr. Amoroso's adamant denial, TSU demanded records of Dr. Amoroso's personal life and subsequently criticized his efforts to protect his constitutionally-guaranteed right of privacy from such an unlawful inquiry.

171.    Dr. Amoroso also had a constitutionally-protected "property" interest in his continued employment on the faculty at TSU.

172.    Having invested almost five years into the tenure-track at TSU, and having progressed along the tenure-track by exceeding all performance measurements incorporated into the tenure process, Dr. Amoroso was entitled to substantive due process when he was not reappointed due to the arbitrary, capricious, and bad faith decision of Dr. Gooch.

WHEREFORE, Plaintiff Luke Amoroso prays for judgment against Defendants allowing him a hearing on his termination or non-renewal, reappointing him to the sixth-year of his tenure-track faculty position, for damages resulting from the loss of his employment, for his costs incurred herein, and for such other and further relief as the Court deems just and proper.

## COUNT V – DEFAMATION

For Count V of his Complaint, Dr. Amoroso states and alleges as follows:

173.    Dr. Gooch stated to numerous members of the TSU faculty and administration that Dr. Amoroso had been suspended in response to serious allegations of misconduct unrelated to the China trip.

174.    These statements were highly defamatory.

175.    These statements were false.

176.    The statements were made either with knowledge of their falsity or with reckless disregard for the truth thereof.

177.    As a direct result of these statements, Dr. Amoroso's reputation in his profession and his career in higher education have been seriously damaged.

WHEREFORE, Plaintiff Luke Amoroso prays for judgment against Defendants in an amount that is fair and reasonable, for damages resulting from the loss of his employment, for his costs incurred herein, and for such other and further relief as the Court deems just and proper.

## COUNT V – 42 U.S.C. § 1983

For Count VI of his Complaint, Dr. Amoroso states and alleges as follows:

178.    Defendant Gooch and any other administrator who participated in the termination or non-renewal of the Contract acted under color of state law.

179.     The acts and omissions of Dr. Gooch and other TSU employees and agents deprived Dr. Amoroso of his rights guaranteed by the Constitution and laws of the United States.

180.     As a direct result of the deprivation of his rights, Dr. Amoroso has sustained damages as previously set forth herein.

WHEREFORE, Plaintiff Luke Amoroso prays for judgment against Defendants allowing him a hearing on his termination or non-renewal, reappointing him to the sixth-year of his tenure-track faculty position, for damages referenced in this Complaint, for his costs incurred herein, and for such other and further relief as the Court deems just and proper.

**MURPHY, TAYLOR, SIEMENS & ELLIOTT P.C.**

By: */s/ Seth W. Slayden*
SETH W. SLAYDEN                68404 (MO)
3007 Frederick Avenue
St. Joseph, Missouri 64506
Telephone:        (816) 364-6677
Facsimile:        (816) 364-9677
Email: sethslayden@mtselaw.com

***Attorneys for Plaintiff Luke W. Amoroso, PhD***