**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**NORTHERN DIVISION**

| | |
|---|---|
| LUKE W. AMOROSO, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | ) CASE NO. 2:20CV55 HEA |
| | ) |
| JANET GOOCH | ) |
| and TRUMAN STATE UNIVERSITY, | ) |
| | ) |
|     Defendants. | ) |

## <u>OPINION, MEMORANDUM AND ORDER</u>

This matter is before the Court on Defendants' Motion to Dismiss Plaintiff's

Complaint, [Doc. No. 11].  Plaintiff opposes the Motion and has filed a

Memorandum in opposition, to which, Defendants have filed a reply.  For the

reasons set forth below, the Motion is granted in part and denied in part.

### Facts and Background[1]

Plaintiff's Complaint alleges the following:

From June 2013 until April 27, 2020, Plaintiff was employed by Truman

State University, ("TSU"), as an Assistant Professor of Linguistics. Defendant

Gooch was employed by TSU as the Provost and Vice-President of Academic

Affairs and acting within the course and scope of her employment during the

---

[1] The recitation of facts is set forth for the purposes of this Opinion only. It in no way relieves the parties of the necessary proof of the facts in later proceedings herein.

events which gave rise to this action.  Defendant TSU is a public University that receives funds from the federal and state governments.

In a letter (the "Termination Letter") from Defendant Gooch, dated April 27, 2020, Plaintiff was notified that his employment with TSU had been terminated. Plaintiff was not terminated on the basis of established and published criteria for the evaluation of TSU faculty. Plaintiff was not terminated on the basis of his teaching ability. Plaintiff was not terminated on the basis of scholarship. Plaintiff was not terminated for his service contributions on behalf of TSU. Plaintiff alleges that he was terminated so that he would be the scapegoat to shield TSU from potential litigation related to a student intern program in mainland China.

Plaintiff was first appointed to the regular academic staff of TSU in 2015 for a one-year term as an Assistant Professor of Linguistics. Plaintiff was reappointed as an Assistant Professor of Linguistics by TSU for successive one-year terms in 2016, 2017, 2018, and 2019. Plaintiff was in his fifth year on the tenure track at TSU when he was terminated by Defendant Gooch.

By Notice of Appointment, dated June 14, 2019, (the "Contract"), Plaintiff was reappointed to the position of Assistant Professor of Linguistics at TSU for the period commencing August 14, 2019, and ending on May 15, 2020. The Contract contained the following language: "[This Notice of Appointment] is subject to the

rules, orders, and regulations of the Board of Governors, including, for academic staff, the Academic Tenure Regulations established by the Board of Governors." The Contract incorporates into its terms the Code of Policies (the "Policies") adopted by the TSU Board of Governors.

The Policies provide for two types of academic faculty positions at TSU: term appointments for non-tenured faculty and continuous appointments for tenured faculty. The tenure track at TSU is a seven-year process in which a member of the regular academic staff, such as Plaintiff, is employed pursuant to successive one-year term appointments. Pursuant to the Policies, the tenure track at TSU annually reviews the performance of faculty, including Plaintiff, on the basis of teaching, scholarly work, and service.

Tenure-track faculty members, such as Plaintiff, invest a great amount of time and talent working toward tenure in reliance upon the promise that TSU will fairly and objectively evaluate their annual performance, free from unfounded criticism or unproven accusation.

In each of his five years at TSU, Plaintiff received outstanding reviews of his performance as a faculty member by his peers, students, and others. Two years before his termination in April 2020, Plaintiff had successfully completed his midpoint tenure review with Dean James O'Donnell, who observed that "Plaintiff's work in the domains of teaching, scholarly work, and service during

these first three years in the Department of English & Linguistics has been outstanding."

The midpoint tenure review is a milestone event in obtaining tenure at TSU. The termination of a tenure-track faculty member in his fifth year at TSU is extremely rare.

Pursuant to the Policies and past practice at TSU, a tenure-track faculty member may be non-renewed on the basis of unsatisfactory performance in teaching and advisement, scholarship, and service. Although a tenure-track faculty member could also be terminated due to financial exigencies of TSU, Plaintiff was not terminated due to any financial exigencies. With respect to non-renewal of a tenure-track faculty member on the basis of performance in teaching and advisement, scholarship, and service, the Policies provide a process of awarding tenure at TSU based upon well-documented annual feedback to the tenure-track faculty member as to whether or not he is making satisfactory progress in areas of teaching and advising, scholarship and service. Plaintiff has always received exemplary annual reviews regarding his performance in the areas of teaching and advising, scholarship, and service.

Prior to the decision of Defendant Gooch to terminate his employment, Plaintiff had been assured in each of the four previous years that he was definitely on track to receive tenure, including his comprehensive midpoint tenure review.

The Policies also provide that the tenure-track faculty member works primarily with his Department Chair and Academic Dean to determine appropriate evidence for the demonstration of quality teaching activity that advances student learning, scholarship that encompasses academic and creative contributions to the intellectual life of the university and the profession, and service that offers contributions to the university, the profession, and the enrichment of campus life, as well as discipline-based or university mission-oriented contributions to the community. The Policies and other procedures promising a merit-based path to obtaining tenure exist to aid in TSU's recruitment and retention of faculty.

TSU awards tenure at a higher rate than other post-secondary educational institutions as a way to compete with other institutions that have more resources available to them than TSU.

Plaintiff was recruited to TSU and induced to remain employed there in reliance upon the promise of TSU to abide by the Policies in evaluating his performance as he worked toward tenure as a faculty member.

Pursuant to the Policies, a tenure-track faculty member may be terminated due to misconduct justifying termination for cause. With respect to termination for cause, the Policies provide that a member of the regular academic staff under a term appointment, such as Plaintiff, may only be terminated for cause prior to expiration of the term appointment. The Policies provide "the dismissal for cause

of a teacher previous to the expiration of a term appointment, should, if possible, be considered by both a faculty committee and the governing board of the institution" The Policies contain a detailed procedure to guarantee due process to a terminated faculty member prior to the expiration of a term appointment, including, but not limited to, the following:

a. Removal for cause must be recommended by the Dean or other appropriate administrative officer designated by the Board of Governors.

b. The faculty member must be informed in writing of the charges against him.

c. Suspension of the faculty member, if the charges would interfere with the faculty member's duties and/or effectiveness as a teacher.

d. Review before the Committee on Tenure, if requested by the faculty member.

e. Review of the Committee on Tenure's decision before the Board of Governors of TSU.

These procedural safeguards were not followed by Defendant Gooch and TSU when Plaintiff was terminated for cause. Plaintiff's termination was not recommended by the Dean. Plaintiff was not informed in writing of the false charges purportedly warranting his termination. Plaintiff was suspended even

6

though the false charges made against him by Defendant Gooch would not interfere with his duties or effectiveness as a teacher.

Plaintiff requested, and was denied, review of his termination by the Committee on Tenure. Plaintiff was denied review of his termination by the Board of Governors.  Pursuant to the Policies, Plaintiff could not be terminated prior to the expiration of his term appointment without a hearing before the Committee on Tenure and an opportunity to appeal that decision to the Board of Governors.

The termination letter from Defendant Gooch, dated April 27, 2020, stated the false allegation that Plaintiff was terminated for "dishonesty", which the Policies define as a termination for cause. The letter from Defendant Gooch, dated April 27, 2020, also vaguely and falsely accused Plaintiff of a "lack of character" without any relevant factual allegation of misconduct that would justify her opinion or warrant his termination. Plaintiff believes this alleged lack of character concerns a patently false and highly defamatory accusation communicated by Defendant Gooch to TSU General Counsel and repeated by him in a letter, dated April 2, 2020.

A few weeks prior to the letter from TSU's General Counsel, Defendant Gooch had stated to Plaintiff's colleagues that he had been suspended for serious allegations of misconduct unrelated to his travel to mainland China with three student interns (the "China trip").

The letter from Defendant Gooch, dated April 27, 2020, also alleges "poor judgement" [sic] in the performance of his faculty responsibilities in connection with the "China trip."

The false accusations of dishonesty and other misconduct in the referenced letters of April 2 and April 27 establish that Plaintiff was terminated for cause for which the Policies afford him the right to a hearing and other due process.

By the fall term of 2019, Plaintiff had entered his fifth year on the tenure-track and could reasonably expect to be awarded tenure if his performance in teaching, scholarship, and service continued to meet TSU's academic standards.

When Plaintiff made the career decision to join the faculty of TSU in 2015, he did so in reliance upon TSU's fair, objective, and good faith execution of the Policies that govern the attainment of tenure.

By the fall term of 2019, Plaintiff had earned consistently high praise from the TSU administration, faculty, and students for his teaching and advising, scholarship and service in his annual performance reviews.

At the conclusion of his first year as a faculty member at TSU, Plaintiff's tenure-track review was conducted by TSU Dean James O'Donnell, who commended Plaintiff for his many contributions to the University and commented: "In sum, we're fortunate to have him on our faculty." Plaintiff's second-year tenure-track review in 2017, also authored by Dean O'Donnell, described him as

"dynamic, innovative, and engaging", with positive student comments that are "bountiful," and concluding: "It is clear that Luke continues to display accomplishment, vision, high expectations, enthusiasm, effectiveness, and collegiality. I unconditionally recommend reappointment." The third-year tenure-track review of Plaintiff in 2018 stated the summary observation that "it seems clear that Plaintiff's work in the domains of teaching, scholarly work and service during these first three years in the Department of English and Linguistics has been outstanding." Plaintiff's fourth-year tenure-track review in 2019 was performed by Dr. Mary Shapiro, Chair of the Department of English and Linguistics, who was similarly effusive in her praise, noting Plaintiff's "excellent" teaching evaluations; his significant contributions to the department, the University, and his profession; that he is "greatly beloved" by his students; and that he was a finalist for TSU Educator of the Year in 2018. Plaintiff's fifth-year review, dated March 9, 2020, authored by Dr. Shapiro at the very time that he was suspended and in the process of being terminated by Defendant Gooch, reflects the level of performance that he had rendered to TSU:

> I found him to be a thoughtful, reflective practitioner, with sincere concern for the progress of his students and advisees, and evident love of and pride in teaching. His scholarship is current and first-rate, and relates directly to his teaching. I continue to agree with the evaluation given by his midpoint-to-tenure committee, which identified him as being "on a clear path to promotion and tenure," and with the evaluation given by the Provost at the end of last year's review cycle: that Plaintiff was "performing well in all areas: teaching, scholarship and service."

I discussed with Plaintiff the fact that his consulting work with the Federal Bureau of Investigation is, in fact, an important part of his scholarly agenda. His election by his peers to a second term as "master tester" shows the esteem in which they hold his work. This also constitutes another *category* of service for which Plaintiff does not take enough credit – he contributes to the department, the larger campus community, the larger Kirksville community, but also to the discipline and profession.

We are fortunate to have a linguist with this particular combination of skill sets.

I have been barraged all semester with student testimonials for him.

Dr. Amoroso is a pleasure to work with; he is very much the glue that keeps the linguistics program(s) together

In the five years Plaintiff taught at TSU, he was one of a very few faculty members nominated three different years for the high honor of "Educator of the Year," including one year in which he was a finalist.

In spite of this record of outstanding performance and the complete absence of any negative feedback in his annual tenure-track evaluations, Plaintiff was terminated by Defendant Gooch.

Every Spring and Fall semester since the Fall 2013 semester, TSU students have been offered a study abroad program, commonly known as "CHN 550: EFL [English as a Foreign Language] Internship in China," in which TSU students are afforded the opportunity to teach English to students at a middle school and elementary school in mainland China. Each semester, the Chinese host schools arranged for the necessary permission and documentation from the Chinese

consulate to allow the TSU student interns to participate in this student intern program. With the proper visas and documentation in hand by the start of each semester, the TSU student interns were escorted to their destination in China by a member of the TSU faculty. The TSU faculty escort would remain with the student interns for a few days to acclimate them to the community, to their Chinese hosts, and to essential food, transportation, and public safety services for their semester stay in mainland China.

Having lived and traveled extensively in both China and Hong Kong, and being fluent in Mandarin Chinese, in 2017 Plaintiff volunteered to fill the void of a departing professor by serving as the faculty escort for the TSU student interns in the CHN 550 program. For four consecutive semesters, Plaintiff assisted the TSU student interns without complication in preparing for and traveling to their Chinese destination.

From the inception of this China student intern program until the Fall semester of 2019, the TSU student interns had always been allowed to remain in China for the semester and teach in the host schools.

For the Fall 2019 Semester, three TSU students (the "Student Interns") applied for the CHN 550 program.

In early 2019, following the same procedure as on previous occasions, the Principal of the school hosting the Student Interns contacted the Chinese consulate

and obtained approval for them to perform unpaid student teaching during the Fall semester. Following this approval, the Chinese consulate provided the Student Interns with visa applications that were timely submitted as in each previous semester and issued without any complication.

On August 31, 2019, Plaintiff escorted the Student Interns to the city in mainland China where they would be hosted by members of the faculty and administration at the host schools. Consistent with the travel itinerary published by Plaintiff, and in keeping with the procedure followed by him and the previous program coordinators for CHN 550 in years past, Plaintiff remained with the Student Interns in China for four days after their arrival to get them acquainted with their hosts and familiarized with the places where they could obtain items they might need during their four-month stay.

On Thursday, September 5, 2019, Plaintiff departed mainland China, returning through Hong Kong, where he stayed for the weekend. On Monday, September 9, 2019, as he stood in line at the Hong Kong airport waiting to board his return flight to the United States, Plaintiff received a phone call from one of the Student Interns. This Student Intern told Plaintiff that the local police had come to their apartment and asked to examine the Student Interns' passports and other credentials.

It is not unusual in China for the local police to monitor the presence of foreigners within its jurisdiction, and a similar examination of student intern credentials by police had occurred in the Fall 2018 Semester.

The Student Intern told Plaintiff that they might not be allowed to teach. In response to this information, Plaintiff first confirmed that the Student Interns were safe in their apartment, unafraid, and in possession of their passports.

Plaintiff immediately contacted the Chinese host concerning the matter and was assured that it was a minor bureaucratic issue and that the Student Interns would be allowed to teach. Plaintiff then informed Tim Urbonya, TSU Executive Director of International Education, of the situation.

No one at TSU instructed Plaintiff to remain in Hong Kong or to make the long journey back to the mainland where the Student Interns were staying.

Confident that the Student Interns were safe and assured that the matter would be easily resolved by their Chinese hosts, Plaintiff boarded his flight and returned to the United States.

Following his arrival in the United States on the evening of September 9, Plaintiff's intuition was confirmed when he and Mr. Urbonya received an email indicating that there was "Nothing to worry about"; a "new policy" of the Chinese authorities required the host school "to submit certain information to the security office."

The next morning Mr. Urbonya reported to Defendant Gooch that the matter was bureaucratic in nature, would soon be cleared up, and, most importantly, that the Student Interns were safe.

> … the school in China will be able to provide the documentation the public security bureau needs in order to allow the students to teach – but it may take a few days. I'm communicating with the students … . Again, they are not in any danger."

In spite of the best efforts of the Chinese hosts, the TSU study abroad staff, and Plaintiff, the Student Interns were not permitted by the Chinese authorities to teach in China that semester and had to return home.

Plaintiff believes the local Chinese authorities refused to allow the Student Interns to teach because they did not have a Foreign Worker's Permit, even though the Student Interns were not to be paid and previous student interns had not been required to have such a permit. In effect, the local Chinese authorities interpreted Chinese visa laws differently than the Chinese consulate which issued the student visas, and, in effect, the local Chinese authorities prohibited the Student Interns from providing the teaching services that the Chinese consulate had authorized.

Despite not being able to participate in CHN 550, the course schedules of the Student Interns were quickly rearranged so they would not suffer any academic harm or loss of credit hours toward graduation as a result of the cancelled internship.

Plaintiff believes the Chinese laws and regulations pertaining to visas and work permits are numerous, complicated, and not uniformly enforced.

Plaintiff is neither an attorney nor an expert on Chinese visa laws. It was not the responsibility of Plaintiff to provide legal advice concerning the necessary documentation to allow the Student Interns to teach in China. Once the Student Interns credentials had been questioned by the local Chinese authorities, it was not within the expertise or the responsibility of Plaintiff to fix that documentation. Plaintiff has never once been provided with guidance, polices, procedures, or directives concerning the steps he should take if student visas are deemed improper by the hosting country.

At no point from September 9, 2019, the time Plaintiff and TSU first learned of the visa issue, through October 2019, did Defendant Gooch or any TSU administrative officials question Plaintiff about the China trip.

Upon returning to the United States, one of the Student Interns withdrew from TSU. Thereafter, that Student Intern's father expressed concern over the impact the student's withdrawal would have on the student's academic record. The Student Intern's father submitted multiple Sunshine Law requests to TSU for documents, emails, text messages, etc. from TSU faculty and administrators concerning the China trip.

In November 2019, Defendant Gooch approached Plaintiff for the first time and requested his explanation of the visa issue that doomed CHN 550 during the Fall 2019 Semester. On December 12, 2019, Defendant Gooch told Plaintiff for the first time he would receive a letter of reprimand in his personnel file and that he would not be allowed to lead CHN 550 anymore. Defendant Gooch also stated to Plaintiff that the purpose of the letter of reprimand was to placate the Student Intern's father and that TSU feared a lawsuit from him due to the withdrawal of the Student Intern from TSU. During that same meeting on December 12, Defendant Gooch made it abundantly clear to Plaintiff that he would not be fired, that a letter of reprimand was "no big deal," and that the letter served the purpose of showing the student's father that TSU took the matter seriously.

Later that same day, Plaintiff met with his Department Chair, Dr. Shapiro, to inform her of his conversation with Defendant Gooch. The department chair spoke with Defendant Gooch, who reassured Dr. Shapiro that, at worst, Plaintiff had displayed an error in judgment, that he would not be fired, and that he should not "freak out."

On December 20, 2019, Defendant Gooch called Plaintiff to her office and presented him with a letter describing a "Temporary Interim Suspension with Pay until [TSU] is able to investigate the facts and determine if termination of

employment is warranted." The letter stated that Plaintiff was being suspended for

the following reasons:

> On September 5, 2019 during your return to the United States you traveled from Shuizhai to Hong Kong after being told by Tim Urbonya, Executive Director of International Education, to redirect travel to avoid Hong Kong.
>
> You subsequently remained in Hong Kong until September 9, 2019 when you had no [TSU] business/purpose for being there.
>
> While in line to board your flight home to Chicago, you were contacted by [a Student Intern] saying that the students would not be able to teach in Shuizhai and in spite of this information, you boarded the plane and returned to the U.S.
>
> You made no attempt to contact Tim Urbonya, or anyone else to report the problem and by the time you returned to Kirksville, Tim had already been informed of the problem via Truman State Department of Public Safety.

Defendant Gooch's letter "called into question" Plaintiff's alleged failure to

obtain the proper visas for the students, his weekend in Hong Kong, and his

"failure to exercise due care" in returning to the U.S. after being contacted by the

Student Intern. Defendant Gooch's letter stated that Plaintiff's suspension was

effective immediately, was indefinite, and would last until TSU could "determine

if termination of employment is warranted."

On the very same day that he was suspended by Defendant Gooch, Plaintiff

presented her with a written response to the suspension that refuted each of her

accusations with supporting documents and explained why the suspension was

unwarranted,

Tim Urbonya, Will Storm, and I agreed that Hong Kong should be avoided for travel with the students. I re-routed travel to avoid Hong Kong on the trip to China and the students and I flew through Beijing instead. At this point, all of us (students and I) still had return tickets through Hong Kong. … Tim did not direct me to avoid Hong Kong on my return trip to the U.S. from China.

I took 3 personal days over a weekend in Hong Kong after getting the interns set-up in Shuizhai. I paid for this myself and did not charge [TSU] funds for my hotel, travel, or food on those days.

While boarding my flight to return to the U.S., [a Student Intern] contacted me and said that the interns had been interviewed by the police and that their passports had been taken for inspection by the local authorities. [The Student Intern] said that they thought the interns might not be able to teach, but that they were unsure. I asked [the Student Intern] if the interns were safe. [The Student Intern] said "yes." I asked if they were in their apartments and if they could move about the town freely. [The Student Intern] said "yes." I asked if they had their passports. [The Student Intern] said "yes." I immediately tried to make contact with Kevin (my primary contact at Shuizhai Middle School) as I assumed this was a paperwork matter that the school could handle.

At this point, I needed to decide whether to [return] to the U.S. or return to Shuizhai. I was not worried about the interns' safety in any way. Our interns the previous semester had their passports inspected by the local authorities as well, and with no ill effect. Having your credentials inspected in China is not at all unusual (you give all of your fingerprints, your passport for inspection, and your face to be scanned at every entry and exit from the country) and so I was not concerned with a visit from the authorities to look at passports and visas. Passport inspection is a normal part of life for foreigners in China, and visits from the authorities are not at all unusual.

To be clear, [the Student Intern] did not tell me that the interns would not be allowed to teach, but rather that they thought that was a possibility. My assumption was that there was some kind of miscommunication and that I would get it cleared up upon my return to the U.S. In the 10+ years of the program, the interns were never told that they could not teach, so I assumed the issue would be straightened out relatively quickly by Kevin.

As it would have taken me at least 15-20 hours to return from Shuizhai from Hong Kong, there was nothing I could do immediately in either case, so I decided to return to the U.S.

[After speaking with the Student Intern while waiting to board my return flight to the United States] I immediately tried to make contact with Kevin (my primary contact at Shuizhai Middle School) as I assumed this was a paperwork matter that the school could handle.

As in years past, a letter of invitation was issued by Shuizhai Middle School describing what the interns and I would do in China and why we were invited. I submitted this letter of invitation to the Chinese Consulate in Chicago (via a visa-processing agency), along with visa applications, and, as in years past, the Consulate provided the appropriate visa based on the invitation letter.

I applied for a visa to allow the students to teach in China. The visa was granted. If the Chinese Consulate provides a visa to allow the interns to teach in China, then it is, by definition, the appropriate visa. If the visas obtained were not appropriate, then the Chinese Consulate is at fault, not me.

In terms of "due care" for the interns, this is not a typical faculty-led program. It does not involve, and never has involved, me or the previous internship coordinator staying with the interns in Shuizhai for an extended period of time. I bring them to Shuizhai, help them shop for necessities, walk around town with them and get them oriented to the layout of the city, introduce them to teachers and administrators in Shuizhai and Datian, and then I supervise their coursework remotely as they live independently in China. This is what the students signed up for when they agreed to participate in this internship. This internship requires a great deal of independence. This is how the internship was run by the previous internship coordinator for many years and this is thus how I continued to run it for the 3 years I've been involved. I absolutely provided due care to the interns, as did their hosts in China, who treated them very well. To say that I did not provide due care for the interns is simply not true. I, in concert with our Chinese partners, took excellent care of them.

Upon his arrival in the United States, Plaintiff was immediately in contact

with Tim Urbonya and others, who had independently confirmed and

19

communicated to Defendant Gooch that the Student Interns were in no danger and that the matter should be cleared up in a few days.

Despite offering to meet with Plaintiff in her original December 20, 2019, suspension letter, Defendant Gooch instead called Plaintiff to tell him his suspension would stand. Having shown her allegations to be false, Plaintiff asked Defendant Gooch for an additional explanation for his suspension, to which she replied that she would issue a new suspension letter.

During this telephone conversation, Defendant Gooch stated it "was looking likely" that Plaintiff would be terminated because Plaintiff left the Student Interns in China instead of going back to "be with them."

On January 6, 2020, Defendant Gooch provided her revised suspension letter, which recommended Plaintiff "be placed on Temporary Interim Suspension with Pay until [TSU] is able to investigate the facts and determine if termination of employment is warranted." And narrowed the focus of Plaintiff's suspension to the following: (a) Plaintiff traveling to the United States through Hong Kong; (b) Plaintiff taking personal days to spend in Hong Kong; and (c) Plaintiff's decision to travel to the United States rather than returning to Shuizhai.

As the Spring 2020 Semester started, Defendant Gooch informed TSU faculty of Plaintiff's suspension. On their own initiative, and without the direction, assistance, or involvement of Plaintiff whatsoever, TSU faculty and students began

a letter writing campaign to TSU administration (including but not limited to the Board of Governors and Defendant Gooch) asking for Plaintiff to be reinstated.

Perhaps sensing her mistake in having suspended one of the most popular members of the TSU faculty, Defendant Gooch defended her actions by telling the faculty Plaintiff was being investigated for "serious allegations" unrelated to the China trip. Defendant Gooch reiterated the accusation to Plaintiff's department chair that he was being investigated for "serious allegations." To date, Defendant Gooch has never told Plaintiff what "serious allegations" have been made against him.

When pressed by members of the faculty and Plaintiff's department chair, Defendant Gooch implied that he was being investigated for misconduct that would justify his termination. The actions of Defendant Gooch have led to rampant, salacious, and potentially career-ending rumors and speculation about Plaintiff.

Plaintiff believes Defendant Gooch has, at worst, intentionally and deliberately defamed Plaintiff in order to excuse her decision to suspend Plaintiff in the first place, or, at best, has done so recklessly, indifferently, and in conscious disregard for the rights of Plaintiff.

Despite multiple requests and pleas from Plaintiff and others for the specific nature of the so-called "serious allegations" against him, Defendant Gooch has failed to elaborate on her public comments to TSU faculty and students.

Defendant Gooch held a meeting with the Classical Modern Languages Department and the Department of English and Linguistics on February 4 to discuss Plaintiff's absence from teaching. When asked at that meeting by TSU faculty members, "So are you telling us that there's something else that had happened that you can't talk about that is not his decision making with regards to the visa and that's the thing that's being investigated,?" Defendant Gooch replied, "I'm just saying there is more than what seems to be at the surface."

Near the end of this meeting, Defendant Gooch commented:

"I'm not just [suspending Plaintiff] because I can. Okay. I understand the ramifications. I've had multiple conversations with [Plaintiff's department chair], multiple conversations with [the TSU President and General Counsel]. This is not something I just flipped a coin, heads he's gone… All I can tell you is that this is not an easy decision for the administration, **and** there's more to it, okay."

By her comments, Defendant Gooch clearly insinuated that Plaintiff was not suspended because of his alleged failure to obtain proper visas.

Plaintiff believes Defendant Gooch told TSU faculty and administrators on other occasions that Plaintiff's suspension did not relate to anything that happened to the interns in China.

In spite of Defendant Gooch's statements to faculty and administrators that "there's more to it," the suspension letters from Defendant Gooch to Plaintiff centered around CHN 550.

Contrary to the suspension letters and consistent with the public and private comments of Defendant Gooch, the letter from TSU General Counsel, dated April 2, 2020, falsely accused Plaintiff of misconduct unrelated to CHN 550. The Termination Letter made false accusations of unspecified misconduct.

Although Defendant Gooch has attempted to disguise her action as a non-renewal of Plaintiff's sixth-year contract in an attempt to avoid a hearing before the Committee on Tenure and review by the Board of Governors, the action was a "de facto" termination for cause prior to the expiration of a term appointment. Defendant Gooch and TSU had no performance-based information to justify a non-renewal of Plaintiff's sixth-year contract.

Plaintiff believes Defendant Gooch has never refused to renew a contract for a sixth-year tenure-track faculty member.

Plaintiff believes Defendant Gooch and TSU attempted a non-renewal of Plaintiff's sixth-year contract, because they had a reasonable degree of confidence that Plaintiff would be absolved of any wrongdoing by the Committee on Tenure and the Board of Governors.

Plaintiff's Complaint brings a Count for denial of procedural due process, (Count I); breach of contract, (Count II); breach of good faith and fair dealing, (Count III); denial of substantive due process, (Count IV);  defamation, (Count V); violation of 42 U.S.C. Defendants move to dismiss the Complaint for failure to state a cause of action pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## Standard of Review

The purpose of a Rule 12(b)(6) motion to dismiss for failure to state a claim is to test the legal sufficiency of a complaint so as to eliminate those actions "which are fatally flawed in their legal premises and deigned to fail, thereby sparing the litigants the burden of unnecessary pretrial and trial activity." *Young v. City of St. Charles*, 244 F.3d 623, 627 (8th Cir. 2001). This court "accepts as true the complaint's factual allegations and grants all reasonable inferences to the non-moving party." *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 512 (8th Cir. 2018)(citations omitted).

To survive a 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *McShane Constr. Co., LLC v. Gotham Ins. Co.*, 867 F.3d 923, 927 (8th Cir. 2017), *quoting Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The complaint "must provide 'more than labels and conclusions, and a formulaic recitation of the

elements of a cause of action will not do.' " *Id.*, *quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*, *quoting Iqbal*, 556 U.S. at 678; *see also, Metro. Omaha Prop. Owners Ass'n, Inc. v. City of Omaha*, No. 20-1006, 2021 WL 952678, at *2 (8th Cir. Mar. 15, 2021).

In addressing a motion to dismiss, "[t]he court may consider the pleadings themselves, materials embraced by the pleadings, exhibits attached to the pleadings, and matters of public record." *Illig v. Union Elec. Co.*, 652 F.3d 971, 976 (8th Cir. 2011).

## Discussion

### Count I

Count I of the Complaint alleges a denial of procedural due process. Plaintiff claims that based on the language of the Contract and the Policies incorporated into the Contract he had a property interest in the retention of his employment as a faculty member at TSU.  He further claims the Contract and the Policies dictate the grounds upon which he could be terminated for case.

A claim for violation of due process may be procedural or substantive. *Creason v. City of Wash.*, 435 F.3d 820, 824 (8th Cir. 2006). A procedural due process violation requires the following elements: (1) a protected life, liberty, or

property interest; (2) the deprivation of the same; and (3) the state's failure to provide adequate procedural rights before impinging upon the protected interest. *Mulvenon v. Greenwood*, 643 F.3d 653, 657 (8th Cir. 2011). A substantive due process violation requires the following elements: (1) violation of a constitutional right; and (2) that the state officials' conduct in violating the right "was shocking to the contemporary conscience." *Flowers v. City of Minneapolis, Minn.*, 478 F.3d 869, 873 (8th Cir. 2007).

Whether the due process violation alleged is procedural or substantive in nature, the threshold question is whether the right at issue is protected by the due process clause. *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972); U.S. Const. amend. XIV ("[n]o [s]tate shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any [s]tate deprive any person of life, liberty, or property, without the due process of law; nor deny to any person within its jurisdiction the equal protection of the laws").

Property rights are not created by the Constitution; rather, rights potentially protectable in due process arise from an "existing rule or understandings that stem from an independent source such as state law - rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Roth,* 408 U.S. at 577. A cognizable property right is one to which a person has a legitimate

claim of entitlement, rather than a "unilateral expectation of it." *Id*. The Supreme Court has identified two bases that might underlie a cognizable claim for violation of due process: (i) an entitlement created by state statute; and/or (ii) an entitlement created by a contract between the plaintiff and the state. *Roth*, 408 U.S. at 577.

Plaintiff's due process claim arises under the Fourteenth Amendment to the United States Constitution. "The Due Process Clause of the Fourteenth Amendment entitles a person to procedural due process when a protected property interest is at stake." *Schueller v. Goddard*, 631 F.3d 460, 462 (8th Cir. 2011). "A protected property interest is a matter of state law involving 'a legitimate claim to entitlement as opposed to a mere subjective expectancy.' " *Snaza v. City of Saint Paul,* 548 F.3d 1178, 1182-83 (8th Cir.2008) (quoting *Bituminous Materials, Inc. v. Rice Cnty.,* 126 F.3d 1068, 1070 (8th Cir.1997)) "Property interests are not created by the Constitution, 'they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law....' " *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538 (1985) (quoting *Bd. of Regents of State Colleges v. Roth,* 408 U.S. 564, 577 (1972)). But "*federal constitutional law* determines whether that interest rises to the level of a legitimate claim of entitlement protected by the Due Process Clause." *Town of Castle Rock, Colo. v. Gonzales,* 545 U.S. 748, 757 (2005) (quotations and citations omitted). An "entitlement" is defined as "[a]n *absolute right* to a ... benefit ... granted

immediately upon meeting a legal requirement." *Stevenson v. Blytheville Sch. Dist. #5*, 800 F.3d 955, 968 (8th Cir. 2015) (quoting Black's Law Dictionary 612 (9th ed. 2009)).

TSU's "alleged failure to follow its own procedural rules and regulations did not, without more, give rise to a protected liberty or property interest. *See Swenson v. Trickey,* 995 F.2d 132, 134 (8th Cir.), *cert. denied,* 510 U.S. 999, 114 S.Ct. 568, 126 L.Ed.2d 468 (1993); *Stow v. Cochran,* 819 F.2d 864, 867–68 (8th Cir.1987)." *Batra v. Bd. of Regents of Univ. of Nebraska*, 79 F.3d 717, 720 (8th Cir. 1996).

> As a non-tenured employee, however, [Plaintiff] did not have any right to employment beyond the fulfillment of the one-year contract he was operating under at the time his tenure was rejected. Moreover, in the context of a non-tenured teacher or professor, the law is quite clear:
>
>> For a [protected] property interest to arise, a government employee must have a "legitimate claim of entitlement" to continued employment, as opposed to a mere subjective expectancy. "Absent unusual circumstances, a teacher in a position without tenure or a formal contract does not have a legitimate entitlement to continued employment."
>
> *Batra v. Board of Regents of University of Nebraska*, 79 F.3d 717, 720 (8th Cir. 1996) (*respectively quoting Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 2709 (1972) *and Geddes v. Northwest Mo. State Univ.*, 49 F.3d 426, 429 (8th Cir.1995) ). Even affording a liberal reading to [Plaintiff's] complaint, it is evident that he cannot establish a legally sustainable cause of action for a constitutional violation under section 1983.

*Cron v. Bd. of Governors of Missouri State Univ.*, No. 06-03130-CV-S-JTM, 2006 WL 8438356, at *2 (W.D. Mo. Oct. 27, 2006).  As such, Plaintiff's Count I fails to state a cause of action and will be dismissed.

**Count II**

Count II is brought as an alleged breach of the August 14, 2019 through May 15, 2020 contract.  Specifically, Plaintiff alleges that he was terminated for cause without a hearing, was not reappointed on the basis of false accusations related to the China 550 program, was not reappointed due to arbitrary criteria unrelated to his performance in the areas of teaching and advisement, scholarship and service, and he was denied a hearing.

Defendants move to dismiss Count II because they claim Plaintiff has not pled any facts supporting a plausible claim that the University breached his 2019-2020 Appointment.  Under the Rule 12(b)(6) standard, however, Plaintiff's claim is sufficient.

Throughout the Complaint, Plaintiff alleges facts that he satisfied his duties under the contract for the term.  He further alleges that he was terminated by the April 27, 2020 letter, (prior to the expiration of the term) and that the reasons given were for dishonesty and false accusations of misconduct.  Taken together with the detailed factual circumstances surrounding the ultimate termination/nonrenewal, and construing the allegations as true, as well as all reasonable inferences that can

be drawn therefrom, this count sufficiently notified Defendants of the claim.  It is not before the Court at this time to ascertain whether Plaintiff will succeed in proving the allegations; all that is required presently is whether Plaintiff has sufficiently notified Defendants of the breach of contract claim against them.  The Court is not at liberty to examine matters outside the record and determine whether there are disputed facts in ruling on a motion to dismiss.

**Count III**

Count III is a claim for a breach of an implied covenant of good faith and fair dealing. In that the Court has determined that the breach of contract claim survives, Count III survives as well.

**Count IV**

Count IV is brought as a deprivation of Plaintiff's substantive due process rights. As discussed *supra*¸ a substantive due process violation requires the following elements: (1) violation of a constitutional right; and (2) that the state officials' conduct in violating the right "was shocking to the contemporary conscience." *Flowers*, 478 F.3d at 873.

> An at-will public employee generally does not have a protected liberty interest in continued employment which would obligate a government employer to provide a hearing in connection with the employee's discharge. *See Speer v. City of Wynne,* 276 F.3d 980, 984 (8th Cir.2002) ( *Speer* ) (citing *Bishop v. Wood,* 426 U.S. 341, 348, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976) (*Bishop* )). An exception exists, however, in cases where an employee is terminated in connection with publicized allegations of illegal or improper conduct. *Id.* In *Board of Regents v. Roth,* 408 U.S. 564, 573, 92

S.Ct. 2701, 33 L.Ed.2d 548 (1972) (*Roth* ), the Supreme Court held that a government employee has a liberty interest in his or her good name and reputation, which is entitled to protection when he or she is fired based on allegations of dishonesty, immorality, or illegality. To establish the deprivation of a liberty interest, a public employee must make a three-part showing: (1) that the public employer's reasons for the discharge stigmatized the employee, seriously damaging his or her reputation or by foreclosing other employment opportunities; (2) that the employer made the reasons for the discharge public; and (3) that the employee denied the charges that led to the discharge. *Speer,* 276 F.3d at 984 (citing *Coleman v. Reed,* 147 F.3d 751, 754–55 (8th Cir.1998)) (additional citations omitted). Where this showing has been made, under the Constitution's procedural due process protections, the employee must be provided with adequate notice and an opportunity to dispute the charges in a "name-clearing" hearing. *Id.* (citing *Codd v. Velger,* 429 U.S. 624, 627–28, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977) (per curiam) (*Codd* )) (additional citations omitted); *Merritt v. Reed,* 120 F.3d 124, 126 (8th Cir.1997) (citing *Bishop,* 426 U.S. at 349, 96 S.Ct. 2074).

*Hammer v. City of Osage Beach, MO*, 318 F.3d 832, 839–40 (8th Cir. 2003)

(footnote omitted).

For his substantive due process claim, Plaintiff alleges that Defendant Gooch specifically harmed his reputation by accusing him if dishonesty, poor judgment, deplorable conduct, and lack of character in the Termination Letter.  Fatal to his claims of the denial of his right to good name and reputation, right to privacy, and his property interest in his continued employment is the lack of publication of the allegedly arbitrary and capricious statements by Defendant Gooch.  Although Plaintiff raises several new claims of what Defendant Gooch said to whom aside from the letter, the Complaint fails to include these claims within it.  As such,

Count IV fails to sufficiently set forth a claim for a deprivation of Plaintiff's substantive due process rights.  Count IV will be dismissed.

**Count V**

Plaintiff claims Defendant Gooch's statements to numerous members of the TSU faculty and administration were false and highly defamatory.  Defendants argue they are entitled to sovereign immunity initially and secondarily, the Complaint fails to state a claim for defamation because there has been no publication outside the university.  Plaintiff argues that the actions were proprietary functions, and therefore not entitled to sovereign immunity, Defendant TSU has purchased insurance coverage for this type of tort and therefore sovereign immunity is waived and the intra-corporate communications exception does not apply.

Plaintiff's complaint fails to set forth any of his bases for stating a claim for defamation.  Defendants are unable to determine these bases for setting forth a viable claim for defamation, i.e. how this is a proprietary function of Defendant Gooch in her duties, what type of insurance Plaintiff claims covers this cause of action, and upon what basis Plaintiff claims the intra-corporate communications exception does not apply.  Plaintiff will be given leave to amend Count V.

**Count VI**

Count VI attempts to state a cause of action under 42 U.S.C. § 1983.  This count must be dismissed because Plaintiff has failed to allege any constitutional violations.  See *supra*.  As such, the Complaint fails to state a cause of action under Section 1983.

## Conclusion

Based upon the foregoing analysis, the Complaint fails to allege a plausible claim for procedural and substantive due process.  It also fails to state a claim for defamation and Section 1983.  Counts I, IV, V, and VI will be dismissed.

Accordingly,

**IT IS HEREBY ORDERED** that Counts I, IV, V, and VI are dismissed. **IT IS FURTHER ORDERED** that Plaintiff is given 14 days from the date of this Opinion, Memorandum and Order to file an Amended Complaint in accordance with the matters discussed herein.

Dated this 14th day of April, 2021.


_____
     HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE